Louis Hirsch Textile Machines, Incorporated, one of the defendants, a manufacturer of knitting machinery, sold and delivered to complainant, a hosiery manufacturer, attachments to be placed upon certain of complainant's machines. These attachments were designed for the purpose of producing hosiery with a special stitch known as mesh. The attachments when placed in operation did not work satisfactorily, and were incapable of producing the type of hosiery for which they were sold and warranted; a controversy arose; there was some correspondence between the parties, and then a part of the attachments was returned. The defendant company assigned its claim for the balance of the purchase price to the other defendant, its president, Louis Hirsch, who brought an action at law against the present complainant for this balance.
The defendant company was neither created nor licensed to transact business under the laws of this state, nor did it maintain any place of business here. Upon discovering that its president-director resided here, complainant promptly filed an action at law against it for breach of warranty and the ensuing damages, no part of which, in excess of the amount sued for by defendant Louis Hirsch, could be recovered by complainant in the law action which the latter had instituted against it. Then the present suit in chancery was filed to restrain defendant Louis Hirsch from proceeding with his said law action; the defendant company herein then asked that the prosecution of complainant's law action against it be likewise restrained, and thereupon jurisdiction was taken by this court, all parties at the same time consenting thereto, upon the allegations of fraud and to prevent a multiplicity of actions; a restraint was granted enjoining the further prosecution of all of the then pending law actions, and all the issues were pleaded in this court with all of the parties involved before it in one suit.
Complainant alleges a claim for special damages in excess of the balance of the price of the attachments. The special damages are based on the assertions that the defendant company *Page 572 
sold the attachments with full knowledge that complainant was to use them to carry out, within a specified time, two large orders for mesh hosiery; that the attachments were warranted, if and when erected upon seven of complainant's machines previously examined for said purpose by said defendant's representative and expert, to be capable of producing merchantable mesh hosiery of the kind and quality called for by said orders; that the attachments when so erected did not so operate; that consequently the said orders could not be filled and were canceled, and that complainant lost the profits it would have otherwise made thereon.
Complainant has established its cause of action and is entitled to the relief sought. The testimony adduced on its behalf is convincing and is corroborated as to many of the main facts by the admissions of the defendants' own witnesses. There seems to be no doubt that the attachments did not operate satisfactorily and were entirely incapable of producing, after having been erected upon the machines for which they were intended, any merchantable mesh hosiery. It was undoubtedly because of this fact that the defendant company, after several months of experimentation and futile efforts towards eliminating existing operating defects, signified its willingness to accept their return for full credit, despite their having been specially furnished for complainant's particular machines.
Defendants assert that it was the alleged change in fashion around Easter of that year, and not the unsuitability of the attachments themselves, that rendered them useless to complainant. This contention is denied by complainant, which supports its denial by evidence indicating no such change to have occurred until the following July; and in addition thereto, by undisputed evidence, from which it appears that no such change in fashion could have possibly destroyed the useability of or desirability for the attachments in question, which concededly were also designed and warranted as being suitable for the production of stockings with a lace stich, the vogue for which had neither ceased nor abated. By way of further answer to defendant's contention, complainant *Page 573 
adduced evidence, which was entirely undisputed, that it had taken orders, the fulfillment of which would consume the entire mesh hosiery production capacity of its plant up until the following summer. All these facts, together with the undisputed fact that complainant, after having removed defendant's attachments from its machines, actually purchased from other machinery manufacturers attachments for the purpose of producing mesh hosiery of the type for the production of which the defendant company had warranted its attachments as being suitable, and with which new attachments it actually manufactured mesh hosiery on the very machines from which it had removed defendant's attachments, furnishes, to my mind, a complete and convincing answer to defendant's contention.
It is entirely undisputed that nothing but defective and unmerchantable mesh hosiery was ever produced on any of the defendant company's attachments. Defendants inferentially seek to place the blame for this upon the complainant although their own expert admitted that, notwithstanding his many and careful examinations to detect and surmount, if possible, the operating defects complained of, he was unable to find any fault with, nor had any criticism to make about, the manner in which complainant had erected or operated either the machines or the attachments. And it was elicited from this same expert, on cross-examination, that he made many different changes in and to these attachments in an effort to cure the various operating defects which they presented and which complainant, from time to time, called to his personal attention and observation; and that notwithstanding the changes which he made in the break bands, in the pattern wheels, in the lines for shifting the narrowing rollers, in the shaft for holding the shifting forks, in the pusher cams and in other constituent members of the attachments, these defects were neither surmounted nor eliminated, but continued to exist. It is significant, indeed, that attachments made by another machinery manufacturer operated properly and produced merchantable mesh hosiery when *Page 574 
erected upon complainant's very machines from which the defendant company's attachments had finally been removed.
This same expert, on cross-examination, also admitted that these attachments were not equipped (1) with an automatic spring pressure control to regulate the different amounts of pressure required to permit the proper rotation of the steel roller from the convex to the concave points on the pattern disc; (2) with an automatic break tension control to regulate the variations in the amount of break tension required to permit of the proper rotation of the steel roller over the convex as well as the concave surfaces of the pattern disc; (3) with a device to release the maintained pressure contact between the steel roller and the pattern disc while the disc is in the process of revolving itself into a proper position, preparatory to the machine making what is known or referred to as a "dip," nor (4) with any compression control to regulate the varying compressions under which the attachment must operate when called upon to engage more or less needles on the machine, as the particular operation may require, and all of which devices or mechanisms he conceded were essential, if not indispensable, to the accurate operation of the attachment and the manufacture of merchantable mesh hosiery thereby.
This and other evidence furnishes abundant corroboration to the testimony adduced on behalf of complainant, and fully convinces me that the attachments were not suitable for complainant's particular machines nor capable of producing thereon the kind of mesh hosiery for which they had been warranted, and also satisfies me that complainant was induced to continue, for the time it did, in its efforts to make them workable only because of its being assured by defendant company that the attachments would "break-in" and operate properly, which assurance up to the cancellation of the orders in question had not yet materialized, nor did it ever thereafter.
The testimony of defendants' experts and friends of long standing, Messrs. Nebel, Hahn, Neudert, Beuter and Schram appears to have little, if any, bearing upon the issues here involved. None of them ever saw a single complete one of *Page 575 
the attachments in question; a single one of complainant's particular machines; any attachments of the same type, construction and proportions as the ones in question in actual operation on machines of a type, gauge and speed similar to those of complainant; nor did any of them claim to have ever manufactured, personally or under their supervision, mesh hosiery of the same design, kind, quality and construction as that for which the attachments were here warranted. Their testimony appears to be limited to their respective experiences with mesh attachments erected and operated on machines of types, gauges and speeds different than those of complainant, and with the production of mesh hosiery embodying a more restricted range or needle movement than that for which the attachments in question were warranted. Their testimony, aside from being of a collateral nature, was greatly impaired as to credibility by their having denied discussing or even knowing, before being called to the stand, what they were expected to testify to; whereas it was subsequently elicited on cross-examination of Albert Friedmann that he had furnished them, in advance of their being called to the stand, with written questions and answers appertaining to the testimony which they were expected to give.
I am fully satisfied from the testimony adduced on behalf of complainant that it had the orders which were to be filled by use of the attachments and that the defendant company was apprised and knew of these orders and undertook to deliver attachments which it warranted fit and suitable for that purpose. The defendant company is therefore liable for the special damages consisting of the loss of the profits shown to have been sustained. Hadley v. Baxendale, 9 Exch. 341; Witherbee v.Meyer, 155 N.Y. 446; 50 N.E. Rep. 58, 60; Wolcott, Johnson Co. v. Mount, 36 N.J. Law 262, 272; affirmed, 38 N.J. Law 496;McAndrews v. Tippett, 39 N.J. Law 105, 111; Pope v. Ferguson,82 N.J. Law 566.
Defendants endeavored to enshroud the existence of the larger of these two orders with an atmosphere of suspicion by attempting to show that this particular customer's ordinary *Page 576 
method of purchasing merchandise was only upon written order signed by the particular "buyer" in its employ by whom the order is placed. In this, however, they were unsuccessful, and incidentally established the contrary to be the fact. The customary method in which this customer purchased merchandise from complainant and several other concerns, appears to have been that its "buyer," in charge of its particular department for which the merchandise was desired, would place the order verbally, sending his signed written confirmation only after the merchandise in question had been shipped to and actually received by the customer; which was as had been testified to on behalf of complainant. This was demonstrated by a great many of the written confirmatory orders which defendants themselves produced at the trial.
Leon Klein and Fred D. Crawford, witnesses produced by defendants, testified that this particular customer's method of buying merchandise was only upon the signed written order of the "buyer" in charge of the particular department for which the merchandise is intended. To substantiate their testimony they produced numerous signed written orders which they claimed to have procured for their respective employers from the customer in question. Upon cross-examination, however, it developed that the orders so produced, indicated upon their faces, that the merchandise purchased, in most instances, was upon a mere verbal order which was confirmed in writing only after the customer had actually received the merchandise. In view of this, I am unable to attach any credence to their testimony.
Complainant produced the customer's "buyer" from whom it had obtained the order in question, and who testified to his having placed the order as well as to his having subsequently canceled it because of complainant's inability to make the specified deliveries. He also testified that the manner in which he gave this particular order was no different than that customarily followed by him in his dealings with complainant and other hosiery manufacturers during a period of years prior thereto. Complainant also produced a great number of written confirmatory orders — ranging over a few years *Page 577 
preceding the order in question and evidencing a vast amount of purchases — which it had received from this "buyer," as well as from four or five other "buyers" of this customer. Nearly all of these confirmatory orders indicated upon their faces, as defendants' witness Crawford was forced to admit, that the merchandise therein specified had been ordered verbally and that signed written confirmation followed only after the merchandise had been shipped to and actually received by the customer.
Defendants had as their chief witness, Albert Friedmann, who then and before was in the employ of the defendant company, and for whom he, pursuant to the authorization of its president, sold the attachments in question to complainant. His testimony does not aid their case. It was from him that the admission was wrung on cross-examination that defendants' other experts, before taking the stand, were furnished with typewritten or manuscript questions and answers — which he and others prepared at a local hotel — appertaining to the testimony which they were expected to give, and which documents he and others had instructed them to read before being called to the stand.
Defendants claim that the right, if any, to special damages did not survive the return of part of the attachments for credit. Aside from the fact that defendants failed to offer any proof of damages under the first count of the counter-claim, electing instead to offer the books of account and to proceed under the second count of the counter-claim, they overlook the fact that the superseding agreement between them, as embodied in the letters of June 20th, 22d and 24th, 1932, contained an express reservation of complainant's right to special damages, and by reason whereof it is entitled to recover such. Leake Cont. 788, cited with approval in McCreery v. Day, 119 N.Y. 1;23 N.E. Rep. 198; 6 L.R.A. 503; Plunkett v. Comstock, Cheyney Co.,211 App. Div. 737; 208 N.Y. Supp. 93; 55 C.J. 290; Hayes v. City ofNashville, 80 Fed. Rep. 641; 4 Comp. Stat. p. 4664 § 70;Alabama Oil and Pipe Line Co. v. Sun Co., 99 Tex. 606;92 S.W. Rep. 253; Joseph Beck Sons v. Danaher, 93 *Page 578 Misc. 537; 157 N.Y. Supp. 503. Defendants deny having received complainant's letter of June 20th, but the evidence satisfies me to the contrary.
I am constrained to find that complainant has proven its case, and is entitled to a decree for damages shown, less the amount proven to be due defendant upon the counter-claim. A decree will be advised accordingly.